UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN AGUILAR,

                    Petitioner,                    Case No. 1:17-cv-735

v.                                                 Honorable Paul L. Maloney

CARMEN PALMER,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner John Aguilar is incarcerated with the Michigan Department of Corrections at the Muskegon Correctional Facility (MCF) in Muskegon, Michigan. On May 10, 2013, following an eight-day trial, a Kalamazoo County Circuit Court jury convicted Petitioner of first-degree murder,[1] first-degree home invasion, and armed robbery. On June 10, 2013, the court sentenced Petitioner as a fourth habitual offender to life imprisonment without parole on the murder conviction, 25 to 75 years imprisonment on the home invasion conviction, and 35 to 75 years on the armed robbery conviction.

---

[1] Petitioner was convicted of first-degree murder under two different theories: premeditated murder in violation of Mich. Comp. Laws § 750.316(a) and murder committed in the perpetration of a robbery or home invasion—felony murder—in violation of Mich. Comp. Laws § 750.316(b). (Trial Tr. VIII, ECF No. 11-13, PageID.1850.)

On August 10, 2017, Petitioner timely filed his habeas corpus petition raising three grounds for relief, as follows:

I.   The state court decision was contrary to, or involved an objectionably unreasonable application of clearly established federal law, and/or an objectionably unreasonable determination of the facts in light of evidence presented in the trial court, when it denied that the court of appeals decision was erroneous when it denied that the trial counsel was not ineffective in permitting evidence of prior bad acts, failing to object to one witness commenting on another witness' testimony, and permitting a witness to comment on the ultimate question of whether defendant was guilty.

II.  The state court decision was contrary to, or involved an objectionably unreasonable application of clearly established federal law, and/or an objectionably unreasonable determination of the facts in light of evidence presented in the trial court, when it denied that the court of appeals decision was erroneous when it denied that the trial court did not err when it failed to grant Defendant's motion for a change of venue because the court followed the suggested steps to minimize the prejudice of pretrial publicity.

III. The state court decision was contrary to, or involved an objectionably unreasonable application of clearly established federal law, and/or an objectionably unreasonable determination of the facts in light of evidence presented in the trial court, when it denied that the trial court erred in assessing $2,589.00 in court costs and fees based on the general operating costs of operating the courthouse because costs are limited to the specific expenses of the case and do not include operating expenses which are properly borne by the public as a whole and not the individual defendant.

(Pet., ECF No. 1, PageID.3-7.)  Respondent has filed an answer to the petition (ECF No. 10) stating that the grounds should be denied because they are without merit, procedurally defaulted, and/or noncognizable.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-

132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless and/or noncognizable.  Accordingly, I recommend that the petition be denied.

## Discussion

### I.    Factual allegations

Petitioner was convicted of invading the home of, robbing, and murdering Robert Medema.  The Michigan Court of Appeals described the trial testimony as follows:

> The jury heard testimony that defendant encountered Medema when Medema purchased a cross at defendant's garage sale and displayed a large amount of cash.  There was evidence that, on a daily basis, Medema visited his friend who lived across the street from defendant.  The jury was presented with evidence that, following Medema's purchase of the cross, defendant followed him to learn where he lived. [Antonio] Livingston testified that on August 10, 2012, he and defendant went to Medema's house.  He further claimed that, after they received a call from Elizabeth Summers, who told them that Medema had left his friend's house, Livingston entered the house through a window the two men had broken and waited for Medema.  Livingston testified that, after Medema came home and saw him, he hit him at least five times in the head with a baseball bat and stole his money.  Livingston stated that after this incident, he, defendant, and Summers went to Detroit, where defendant cleaned his pickup truck, leaving it "immaculate."

(Mich. Ct. App. Op., ECF No. 11-15, PageID.1879) (footnote omitted).[2]  Although the court of appeals was able to summarize the key testimony in a paragraph, the jurors heard testimony for six days.  They deliberated for an entire day before returning their verdict.

---

[2] Antonio Livingston and Petitioner were tried separately.  A different Kalamazoo County Circuit Court jury convicted Livingston of the same offenses of which Petitioner was convicted.  Petitioner was tried about a month after Livingston was sentenced.  Livingston testified at Petitioner's trial. (Trial Tr. V, ECF No. 11-10, PageID.1460-1517.)  He did not receive any consideration for his testimony. (*Id.*, PageID.1517.)

Petitioner, with the assistance of counsel, appealed his convictions to the Michigan Court of Appeals.  Petitioner filed two briefs.  In the brief filed with the assistance of counsel, Petitioner raised the three-pronged ineffective assistance of counsel claim included as issue I in his petition.  In Petitioner's supplemental *pro per* brief, Petitioner raised the venue issue included as issue II in his petition.  By unpublished opinion issued November 20, 2014, the Michigan Court of Appeals affirmed Petitioner's convictions.  (Mich. Ct. App. Op., ECF No. 11-15, PageID.1879-1882.)

Petitioner then filed a *pro per* application for leave to appeal the court of appeals decision in the Michigan Supreme Court.  In his application, Petitioner raised, for the first time, the court costs issue included in his petition as issue III.  On July 26, 2016, the supreme court, in lieu of granting leave, remanded the costs issue to the trial court.  (Mich. Order, ECF No. 11-16, PageID.1970.)  In all other respects, however, the supreme court denied leave to appeal.  (*Id.*)

On August 16, 2016, the trial court affirmed its prior assessment of costs. (Kalamazoo Cty. Cir. Ct. Docket Sheet, ECF No. 11-1, PageID.197.)  Petitioner did not appeal that order.  Instead, he filed his habeas petition in this Court.

## II.    AEDPA standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An

4

application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37-38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### III.    Court costs (habeas issue III)

Petitioner argues that the trial court's assessment of $794 in miscellaneous costs is not authorized by Michigan statute.  Petitioner's claim is not cognizable on habeas review.  In *Washington v. McQuiggin*, 529 F. App'x 766 (6th Cir. 2013), the Sixth Circuit Court of Appeals considered the limits of habeas jurisdiction with regard to orders to pay fines or restitution.  The court explained that under § 2254 subject matter jurisdiction exists only for claims that a person is "in custody" in violation of the Constitution or laws of the United States.  *Washington*, 529 F. App'x at 772-773 (citing *Dickerson v. United States*, 530 U.S. 428, 439 n.3 (2000) (quoting 28 U.S.C. § 2254(a)).  Orders compelling the payment of fines or restitution, therefore, "fall outside the scope of the federal habeas statute because they do not satisfy the 'in custody' requirement of a cognizable habeas claim."  *Id*. at 773; *see also United States v. Watroba*, 56 F.3d 28 (6th Cir. 1995) (holding that § 2255 does not grant subject matter jurisdiction over restitution orders); *Michaels v. Hackel*, 491 F. App'x 670, 671 (6th Cir. 2012) (stating that a fine is not cognizable under § 2254 and citing *Watroba*, 56 F.3d at 29); *Kennedy v. Nagy*, No. 18-1463, 2018 WL 3583212, at *2 (6th Cir. July 12, 2018) ("Kennedy argues that the trial court erred by ordering him to pay restitution, court costs, and attorney's fees without first considering his financial situation . . . [T]hese claims are not cognizable in a federal habeas proceeding because noncustodial punishments do not satisfy the 'in custody' requirement of § 2254."). The fact that a petitioner might be subject to a custodial penalty does not make available to him collateral relief from a noncustodial punishment such as an order to pay fines or restitution.  *Washington*, 529 F. App'x at 773.

Petitioner has not been ordered to pay fines or restitution; he has been ordered to pay court costs.  In *Washington*, the noncustodial penalty at issue was not an order to pay fines or restitution either—it was an order to pay attorney's fees.  That difference, however, did not make Washington's claim cognizable on habeas review:

> For habeas purposes, it is difficult to distinguish—and Washington does not attempt to distinguish—an order imposing attorney's fees from a fine or restitution order.  Although the question of whether a claim satisfies the "in custody" requirement is to some extent one of degree, *Nelson v. Campbell*, 541 U.S. 637, 646 (2004), a fee-repayment order falls outside of even "the margins of habeas," *id.*, because it is "not a serious restraint on . . . liberty as to warrant habeas relief." *Tinder*, 725 F.2d at 805; *Bailey*, 599 F.3d at 979 (quoting *Tinder*).

*Washington,* 529 F. App'x at 772-73.  For the same reasons, Petitioner's habeas challenge to the costs imposed upon him is without merit because it is outside the scope of the federal habeas statute.[3]

## IV.    Venue change due to pretrial publicity (habeas issue II)

Petitioner argues that he was denied a fair and impartial jury.  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ."  U.S. Const. amend. VI. The right to an impartial jury is applicable to the states via the Fourteenth

---

[3] Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim.  *Id.* at 844, 848; *see also Picard v. Connor*, 404 U.S. 270, 275-77 (1971); *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). Petitioner has never fairly presented the "court costs" issue to the court of appeals. Although the habeas statute prevents the Court from granting habeas relief on an unexhausted claim, 28 U.S.C. § 2254(b)(1), the Court may still deny relief on such a claim, 28 U.S.C. § 2254(b)(2).

Amendment.  *See Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Further, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment."  *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations omitted).

If potential jurors have been exposed to prejudicial pretrial publicity, "it jeopardizes a defendant's right to a fair trial by an impartial jury . . . ."  *Campbell v. Bradshaw*, 674 F. 3d 578, 593 (6th Cir. 2012).  The prejudice resulting from pretrial publicity can be presumptive or actual.  *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007).  "Presumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community."  *Id.*

Petitioner has the burden of demonstrating the existence of prejudice.  *Sheppard v. Maxwell*, 384 U.S. 333, 353 (1966).  Petitioner notes that the victim here was a well-known and respected member of the community and that the crime garnered significant media attention.[4]  He claims that clearly established federal law

---

[4] Petitioner claims there was significant media coverage of the crime, but he does not provide any media accounts, nor does he explain the pervasiveness or content of such coverage.  Based on references to such coverage during *voir dire*, however, the Court accepts Petitioner's claim regarding media coverage as true.  Moreover, even today, an internet search of the victim's name turns up many media accounts beginning during August of 2012, when the crime occurred, through June of 2013, when Petitioner was sentenced.  *See* https://www.google.com (search "Robert Medema," visited September 2, 2019).

requires a presumption of prejudice here.  But, Petitioner identifies nothing in the record to support his claim of a "circus-like" atmosphere that might warrant a presumption of prejudice here.  In fact, when the trial judge asked the jury venire for a show of hands with respect to how many had heard about the case, only about a quarter of the potential jurors raised their hands.  (Trial Tr. I, ECF No. 11-6, PageID.429.)  Moreover, though Petitioner's counsel moved for a change of venue based on pretrial publicity (Mot. Hr'g Tr., ECF No. 11-5, PageID.344; Trial Tr. I, ECF No. 11-6, PageID.349-350), counsel did not rely on presumed prejudice.  Counsel acknowledged that the motion depended upon whether prejudices were disclosed during the course of *voir dire*.  (Mot. Hr'g Tr., ECF No. 11-5, PageID.344.)

"[W]here there is an absence of 'presumed prejudice,' the trial court has a responsibility to confront the fact of the publicity and determine if the publicity rises to the level of 'actual prejudice' and a searching *voir dire* of the prospective jurors is the primary tool to determine if the impact of the publicity rises to that level." *Ritchie v. Rogers*, 313 F.3d 948, 962 (6th Cir. 2002).  "The *voir dire* is designed "to . . . expos[e] possible biases, both known and unknown, on the part of potential jurors.'" *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).  But mere knowledge of a newsworthy case does not demonstrate impermissible bias:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved.  In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal

cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Irvin, 366 U.S. at 722-23.

Petitioner's *voir dire* revealed the same sort of media-based "prejudice" as "Murph the Surf" faced in *Murphy v. Florida*, 421 U.S. 794 (1975).[5]  In Murphy's case, the Supreme Court noted that 20 of 78 persons in the venire had expressed some opinion as to his guilt and were excused.  The Court opined that "[t]his may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own."  *Id*. at 803.  Similarly, the fact that one-quarter of the potential jurors had heard about the crime through media reports hardly suggests the presence of actual prejudice in the venire as a whole.

The Michigan Court of Appeals analyzed the prejudice issue as follows:

On the first day of trial, the court acknowledged that defendant's motion was pending, but stated that the motion was completely dependent on jury selection.  Defendant voiced no disagreement, nor did he object to the trial court's plan to individually question all venire members who indicated having any knowledge of the case.  A thorough jury selection process ensued, which included sequestered questioning of any venire member who had any knowledge of the case.  Any venire members who expressed an opinion on defendant's guilt were promptly excused.  Defendant did not use all of his preemptory challenges and expressed his satisfaction with the chosen jury, electing not to reassert his request for a change of venue.  Because the trial court followed the steps

---

[5] Jack Murphy was "notorious for his part in the 1964 theft of the Star of India sapphire from a museum in New York."  *Murphy*, 421 U.S. at 795.

suggested to minimize the prejudice of pretrial publicity by our Supreme Court in *Jendrzejewski*, 455 Mich. at 509-510, defendant expressed his satisfaction with the chosen jury, did not renew his motion, and did not exhaust his preemptory challenges, as well as the general rule that a criminal defendant must be tried in the county where the crime was committed, *People v. Unger*, 278 Mich. App. 210, 253; 749 N.W.2d 272 (2008), we find no error in the trial court's implicit denial of defendant's request for a change of venue.

(Mich. Ct. App. Op., ECF No. 11-15, PageID.1882.)

As clearly established federal law requires, the trial court conducted a searching *voir dire* to ferret out juror bias, whether that bias was the product of media coverage or otherwise. Every potential juror that hinted at bias was removed by the court and almost every juror that indicated some knowledge of the case through media counts was removed by counsel. Only two jurors that indicated some prior knowledge of the case were seated and one of them was removed when the jury was pared down to twelve members for deliberation. The remaining juror acknowledged that he would base his decision entirely on the evidence he heard in court. (Trial Tr. II, ECF No. 11-7, PageID.623-625.)

Review of the trial transcript reveals that the appellate court's factual determinations regarding the *voir dire* and the potential jurors' responses are entirely reasonable. Moreover, Petitioner has failed to demonstrate that the appellate court's determination that the pretrial publicity did not warrant a change of venue is neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, Petitioner has failed to demonstrate that he is entitled to habeas relief on his pretrial publicity claim.

## V.    Ineffective assistance of counsel (habeas issue I)

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  The petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S.

12, 13 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

Petitioner identifies three instances where his counsel provided constitutionally ineffective assistance: counsel permitted testimony of Petitioner's other "bad acts" without objection; counsel failed to object to the prosecutor's questions to Livingston regarding the testimony of Summers; and counsel failed to object to a juror-posed question of a police officer witness regarding why the officer concluded that Petitioner was involved in the plot to rob the victim.  Each claim is discussed below.

### A.    Failure to object to "other bad acts" evidence

Petitioner's counsel, by eliciting testimony and through argument, painted a picture of Petitioner as a petty thief who purchased stolen items, or stole items himself, and then sold them at his garage sale.  Petitioner claims that his counsel's introduction of such "other bad acts" evidence rises to the level of constitutionally ineffective assistance.  The Michigan Court of Appeals disagreed:

> Defendant claims that his trial counsel was ineffective for eliciting testimony from two witnesses, Summers and a police officer, from which the jury could conclude that defendant was a thief.  While defense counsel did elicit such testimony, she did so as part of an acceptable trial

14

strategy.  Counsel established that defendant often stole items and later attempted to sell them at a garage sale.  She even sought testimony that defendant had been suspected in an earlier burglary at a home in Medema's neighborhood.  In closing, counsel used this information in an attempt to portray defendant as a mere thief interested in material goods, not a man interested in stealing money or committing murder. Decisions regarding what evidence to present and how to cross-examine witnesses involve matters of trial strategy, *In re Ayres*, 239 Mich. App. 8, 23; 608 N.W.2d 132 (1999), and we will not second-guess counsel on matters of trial strategy, nor will we assess counsel's competence with the benefit of hindsight, *People v. Horn*, 279 Mich. App. 31, 39; 755 N.W.2d 212 (2008).  Thus, despite the fact that defense counsel's strategy ultimately failed to secure a not guilty verdict, defendant has failed to overcome the presumption that counsel's cross-examination of the two witnesses was sound trial strategy and, accordingly, has failed to demonstrate that her performance fell below objective standards of reasonableness.

(Mich. Ct. App. Op., ECF No. 11-15, PageID.1880.)

The Michigan Court of Appeals considered the issue exactly as clearly established law requires: the panel evaluated whether "under the circumstances, the challenged action 'might be considered sound trial strategy.' "  *Strickland*, 466 U.S. at 689 (quoting *Michel*, 350 U.S. at 101).  Moreover, the state appellate court's assessment of the soundness of counsel's approach is not unreasonable.  Petitioner's counsel faced significant evidence of Petitioner's involvement in some sort of wrongdoing, including Petitioner's responses to police questioning, other witnesses' testimony regarding Petitioner's attempts to recruit them for apparently criminal behavior, and the presence of Petitioner's truck and cell phone in the area of the crime that night.  In addition to that evidence, Antonio Livingston provided detailed testimony regarding Petitioner's involvement in the home invasion, robbery, and murder of Robert Medema.  Counsel had to either argue that all of the evidence was false or find a believable but nonincriminatory—at least with respect to the charged

15

crimes—explanation for much of it, and for anything that went beyond that explanation, brand the witnesses, particularly Livingston, as liars.  The fact that the strategy did not work does not make it unreasonable.   The *Strickland* Court specifically cautions against such 20/20 hindsight.  *Strickland*, 466 U.S. at 680, 689.

Ineffective assistance of counsel claims present mixed questions of law and fact.  *Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000).  Petitioner has failed to demonstrate that the factual determinations of the court of appeals with respect to this claim are unreasonable on the record and he has failed to show that the appellate court's legal determinations are contrary to, or an unreasonable application of, *Strickland*.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

### B.   Witness comment on another witness's testimony

Petitioner next complains that his counsel did not object when the prosecutor, after identifying a couple of inconsistencies between the account witness Livingston provided and the account witness Summers had provided before him, asked Livingston whether Summers was wrong.  The purportedly objectionable exchange reads as follows:

Q:   Did you go back together?

A:   Yes.

Q:   If Elizabeth testified that you two came back separately, is she mistaken?

A:   Can you say that again?

Q:   Elizabeth testified that you two came back to the house separately, was she wrong about that?

A:    No, I don't know if she—matter of fact, yeah, she is wrong about that.  We came inside together.

Q:    Okay.  Had you thrown your pants out the window?

A:    No.

Q:    Elizabeth said you came back without pants on, is she wrong about that?

A:    Yes.

(Trial Tr. V, ECF No. 11-10, PageID.1485-1486.)   Petitioner contends that those questions ask Livingston to comment on the credibility of Summers and, thus, are not proper, and that Livingston's responses are not admissible.

Michigan law holds that a witness may not provide an opinion on the credibility of another witness:

> It is "[t]he Anglo-Saxon tradition of criminal justice . . . [that] makes jurors the judges of the credibility of testimony offered by witnesses." *United States v. Bailey*, 444 U.S. 394, 414 (1980).  Because it is the province of the jury to determine whether "a particular witness spoke the truth or fabricated a cock-and-bull story," *id*. at 414-415, it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial.  *People v. Buckey*, 424 Mich. 1, 17, 378 N.W.2d 432 (1985).  *See also, People v. Peterson*, 450 Mich. 349, 352, 537 N.W.2d 857 (1995).  Such comments have no probative value, *Buckey*, 424 Mich. at 17, 378 N.W.2d 432, because "they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." *Connecticut v. Taft*, 306 Conn. 749, 764, 51 A.3d 988 (2012) (citation and quotation marks omitted).  *See also, People v. Row*, 135 Mich. 505, 507, 98 N.W. 13 (1904) (explaining that opinion testimony regarding a complainant's veracity is not competent evidence).  As a result, such statements are considered "superfluous" and are "inadmissible lay witness [ ] opinion on the believability of a [witness's] story" because the jury is "in just as good a position to evaluate the [witness's] testimony." *People v. Smith*, 425 Mich. 98, 109, 113, 387 N.W.2d 814 (1986).

*People v. Musser*, 835 N.W.2d 319, 327 (Mich. 2013) (footnote omitted).  Interpreting

the Federal Rules of Evidence, the Supreme Court in *United States v. Johnson*, 319

U.S. 503 (1943), considered the admissibility of expert testimony that was challenged

because it "invaded the jury's province."  *Id*. at 519.  The court was not troubled by

the fact that the expert testified regarding ultimate issues:

> No issue was withdrawn from the jury.  The correctness or credibility of
> no materials underlying the expert's answers was even remotely
> foreclosed by the expert's testimony or withdrawn from proper
> independent determination by the jury.  The judge's charge was so clear
> and correct that no objection was made, though, of course, there were
> exceptions to the refusal to grant the usual requests for charges that
> were either redundant or unduly particularized items of testimony.  The
> worth of our jury system is constantly and properly extolled, but an
> argument such as that which we are rejecting tacitly assumes that juries
> are too stupid to see the drift of evidence.  The jury in this case could not
> possibly have been misled into the notion that they must accept the
> calculations of the government expert any more than that they were
> bound by the calculations made by the defense's expert based on the
> defendants' assumptions of the case.  So long as proper guidance by a
> trial court leaves the jury free to exercise its untrammeled judgment
> upon the worth and weight of testimony, and nothing is done to impair
> its freedom to bring in its verdict and not someone else's, we ought not
> be too finicky or fearful in allowing some discretion to trial judges in the
> conduct of a trial and in the appropriate submission of evidence within
> the general framework of familiar exclusionary rules.

*Johnson*, 319 U.S. at 519-20.  Federal Rule of Evidence expressly states that "[a]n

opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid.

704(a).  The parallel Michigan Rule of Evidence is virtually identical.  Mich. R. Evid.

704.  Federal Rule of Evidence 704 was passed for the express purpose of abolishing

case law that opining witnesses could not express opinions on ultimate issues.

Advisory Committee Notes, Fed. R. Evid. 704.  In *United States v. Scheffer*, 523 U.S.

303 (1998), in a concurring opinion, Justice Kennedy quoted the Advisory Committee

Notes to explain the change:

> The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions.    The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information.    7 Wigmore §§ 1920, 1921; McCormick § 12.    The basis usually assigned for the rule, to prevent the witness from "usurping the province of the jury," is aptly characterized as "empty rhetoric." 7 Wigmore § 1920, p. 17.

*Scheffer*, 523 U.S. at 319.

Even if the prohibition of opinion testimony on ultimate issues has softened,

that does not leave the permissible scope of expert opinion testimony boundless.

Federal Rule of Evidence 702—and the parallel Michigan rule—require that the

opinion testimony help or assist "the trier of fact to understand the evidence or to

determine a fact in issue . . . ."    Fed. R. Evid. 702; Mich. Rule Evid. 702.    Expert

opinions that "merely tell the jury what result to reach" would, arguably, be

inadmissible under Rule 702.    Advisory Committee Notes, Fed. R. Evid. 704.[6]

The court of appeals concluded the prosecutor's questions were proper and the

responses admissible:

> Although a prosecutor may not ask a witness to comment or provide an opinion on the credibility of another witness, *People v. Buckey*, 424 Mich. 1, 17; 378 N.W2.d 432 (1985), a prosecutor may attempt to ascertain which facts are in dispute, *People v. Ackerman*, 257 Mich. App. 434, 449; 669 N.W.2d 818 (2003).    The prosecutor's questions to Livingston were not improper because they did not ask him to provide an opinion on

---

[6] It is noteworthy that if such opinions are inadmissible under state and federal law, they are inadmissible under state and federal ***evidentiary*** law, not federal ***constitutional*** law.    Petitioner has presented no federal authority, clearly established by the Supreme Court or otherwise, that holds such testimony inadmissible on constitutional grounds.

Summers' credibility; rather, the questions were an attempt to ascertain and clarify facts that were in dispute. Because the prosecutor's questions were proper, any objection would have been futile, and counsel is not ineffective for failing to raise a futile objection. *People v. Fike*, 228 Mich. App. 178, 182; 577 N.W.2d 903 (1998).

(Mich. Ct. App. Op., ECF No. 11-15, PageID.1880.)[7]

The state appellate court's determination that the comments elicited here were permissible under that rule bind this Court. The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). The Sixth Circuit recognizes " 'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.' " *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76). *See also Thomas v. Stephenson*, 898 F.3d 693,700 n.1 (6th Cir. 2018) (same).

---

[7] The parallel federal rule likewise distinguishes between asking whether another witness is lying and "focus[ing] a witness on the differences and similarities between his testimony and that of another witness." *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006); *see also United States v. Gaines*, 170 F.3d 72, 81-82 (1st Cir. 1999) (explaining that questions that avoid the " 'L' word" and call upon a witness to say whether another was "mistaken" or "wrong" may be acceptable); *United States v. Gaind*, 31 F.3d 73, 77 (2d Cir. 1994) (explaining that "[a]sking a witness whether a previous witness who gave conflicting testimony is 'mistaken' highlights the objective conflict without requiring the witness to condemn the prior witness as a purveyor of deliberate falsehood, i.e., a 'liar.' ").

Thus, if counsel had objected, as Petitioner contends she should have, the objection would have been overruled because it would have lacked merit. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013). That was precisely the conclusion of the Michigan Court of Appeals in rejecting Petitioner's ineffective assistance claim: "counsel is not ineffective for failing to raise a futile objection." (Mich. Ct. App. Op., ECF No. 11-15, PageID.1880.) The appellate court's conclusion is neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief.

Even if the matter at issue implicated federal constitutional law—for example, a violation of due process because of prosecutorial misconduct in posing the question—rather than a matter of state law, Petitioner would not be entitled to relief. For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470

U.S. 1, 11-12 (1985).  Thus, whether evaluated as a claim for prosecutorial misconduct or a claim for ineffective assistance of counsel for failure to object to prosecutorial misconduct, Petitioner must show prejudice.

Petitioner has failed to allege how the prosecutor's questions might have operated to Petitioner's detriment.  If, as Petitioner suggests, the prosecutor was eliciting improper testimony where one witness commented on the credibility of another, it was one prosecution witness commenting on the credibility of another prosecution witness.  To the extent the testimony called into question the testimony of either Summers or Livingston, or both of them, that could only augur to Petitioner's benefit because their testimony incriminated Petitioner.

Indeed, Petitioner's counsel highlighted the differences between the testimony of Summers and Livingston in her closing arguments, urging the jurors to find the less-incriminating testimony of Summers credible and the very-incriminating testimony of Livingston incredible.  Although there does not appear to be anything objectionable about the questions or answers, if there were, counsel's failure to object was likely strategic because the prosecutor's questions bolstered counsel's argument that the two accounts could not be reconciled and that Summers account was the credible one.  And, even if the failure to object were professionally unreasonable, Petitioner has not demonstrated and the record does not support the conclusion that any prejudice resulted.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

### C.    Witness comment on Petitioner's guilt

The prosecutor closed her case with the testimony of lead investigator Detective Bill Moorian.  Detective Moorian testified regarding the course of the investigation.  After direct and cross-examination was complete, the court posed questions crafted by the jurors, including the following: "What led you to conclude that Aguilar was in on the plot to rob Bob Medema?" (Trial Tr. VII, ECF No. 11-12, PageID.1744.)  Detective Moorian, in response, provided an account of the "clues" that focused the investigation on Petitioner.  For the most part, the detective simply rehashed the evidence the jury had already heard:  images from security cameras of Petitioner's vehicle in the area, testimony from others whom Petitioner had tried to recruit to do the crime, corroborating cell phone records, and Ms. Summers' statement regarding her role as a lookout.  Then, Detective Moorian referenced information obtained from "Walt" and, at that point, Petitioner's counsel objected on grounds of hearsay, noting that the jurors had already heard Walter Bojdys testify.  The trial court sustained the objection and prevented the detective from offering any further response.

Nothing Detective Moorian said in response to the open-ended question was particularly novel.  The jury had heard the evidence and, certainly, the jury likely expected that the police suspected Petitioner based on evidence the prosecutor had already presented to the jury.  Nonetheless, state law holds that "[a] witness may not opine about the defendant's guilt or innocence of the charged crimes." (Mich. Ct. App. Op., ECF No. 11-15, PageID.1881.)  Petitioner's appellate panel recognized that the

23

juror's question "essentially asked the officer to explain his belief that defendant was guilty of the charged crimes . . . [and t]hus the question improperly asked the officer to opine on defendant's guilt." (*Id.*)

Even though the court of appeals recognized that the juror's question was objectionable,[8] the court determined counsel's failure to object was not necessarily unreasonable:

> [D]ecisions regarding how a witness should be questioned are presumed to be matters of trial strategy. *Horn*, 279 Mich. App. at 39. Defense counsel may have made the strategic choice that it was best to let the question be asked given that the question was from a juror and she did not want the jurors to become frustrated that some of their questions were not being asked. Defense counsel did object when the officer's answer became lengthy and referenced some evidence that was not presented at trial. Because we will not second-guess counsel on matters of trial strategy and because counsel objected once the officer's answer lengthened and became more damaging to the defense case, we conclude that defendant is not entitled to relief on this claim of ineffective assistance of counsel.

---

[8] Witness opinion on the guilt or innocence of the accused, like opinion on the credibility of a witness, may be objectionable under state and federal evidentiary law, but there is also some authority that witness opinion on guilt violates due process protections. *See, e.g., Cooper v. Sowders*, 837 F.2d 284, 287-88 (6th Cir. 1988). But *Cooper* was decided before enactment of the AEDPA. It expressly relies upon: (1) state court authorities, rather than federal law as clearly established by the Supreme Court; and (2) the cumulation of error, a practice the Supreme Court has never held would support habeas relief. *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) ("The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."). The continuing vitality of *Cooper* after enactment of the AEDPA is questionable. Since enactment of the AEDPA, courts often distinguish the *Cooper* decision. *See, e.g., United States v. Cobb*, 397 F. App'x 128 (6th Cir. 2010); *Arnold v. Palmer*, No. 1:11-cv-840, 2016 WL 4442810 (W.D. Mich. July 25, 2016); *Sanford v. Smith*, No. 2:11-cv-10748, 2013 WL 5913948 (E.D. Mich. Oct. 24, 2013); *Dorsey v. Banks*, 749 F. Supp. 2d 715 (S.D. Ohio 2010). Whatever persuasive force *Cooper* retains, it is not clearly established Supreme Court precedent and, thus, cannot form the basis for habeas relief.

(*Id.*)  The doubly deferential standard of review requires only that there be a reasonable argument that counsel satisfied the requirements of *Strickland*. Petitioner has failed to show that the strategic choice identified by the court of appeals is unreasonable.

Moreover, even if counsel's failure to object might be deemed professionally unreasonable, the appellate court concluded Petitioner had failed to demonstrate prejudice.  (*Id.*, PageID.1881-1882.)  The court reviewed the "[s]trong evidence of defendant's guilt independent of the asserted error of counsel" and determined that Petitioner had not shown "a reasonable probability that, but for the asserted error on the part of his trial counsel, the outcome of the proceedings would have been different."  (*Id.*)  Petitioner has failed to demonstrate that the appellate court's determination regarding prejudice is contrary to, or an unreasonable application of, *Strickland*.  *See, e.g., Lott v. MacLaren*, 569 F. App'x 392, 400 (6th Cir. 2014) (holding that state court's conclusion that petitioner failed to show prejudice was neither contrary to, nor an unreasonable application of *Strickland* where there was "strong evidence" implicating petitioner in addition to officer's improper testimony); *Reynolds v. Sheets*, No. 1:08-cv-1024, 2010 WL 5392870 (N.D. Ohio, Nov. 23, 2010), *report and recommendation adopted in* 2010 WL 5392932 (Dec. 22, 2010).  Accordingly, Petitioner is not entitled to habeas relief.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, I have examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong.  Accordingly, I recommend that the Court deny Petitioner a certificate of appealability.

Moreover, although I conclude that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, I would not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied. Finally, I recommend that the Court not certify that an appeal would not be taken in good faith.

Dated:   September 18, 2019                    /s/ Phillip J. Green
                                               Phillip J. Green
                                               United States Magistrate Judge

## NOTICE TO PARTIES

ANY OBJECTIONS to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).